**WESTERN-SOUTHERN LIFE ASSURANCE COMPANY, Plaintiff,**

**v.**

**George W. KALEH, Defendant.**

**Civil Action No. H-13-1869**

United States District Court, S.D. Texas, Houston Division.

Signed June 16, 2016

**760**

Aaron J. Stucky, Eric W. Richardson, Paul Brown Kerlin, Vorys Sater Seymour and Pease LLP, Houston, TX, for Plaintiff.

Michael V. Brophy, The Brophy Law Firm, PC, Sugar Land, TX, Nancy H. Hamren, Coats Rose Yale et al., Houston, TX, for Defendant.

### FINDINGS OF FACT & CONCLUSIONS OF LAW

DAVID HITTNER, United States District Judge

On October 5, 2015, this Court commenced a non-jury trial in the above-entitled matter. During the course of the five-day proceeding, the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during the trial, along with post-trial submissions and the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any finding of fact that should be construed as a conclusion of law is hereby adopted as such. Any conclusion of law that should be construed as a finding of fact is hereby adopted as such.

### I. BACKGROUND

This is a breach of guaranty case. Plaintiff Western-Southern Life Assurance Company ("WSLAC") brought suit seeking to enforce three guaranties signed by Defendant George W. Kaleh ("Kaleh"). The guaranties secured two loan agreements, which financed the development of a luxury apartment complex in Houston, Texas. The borrowers on the loan agreements defaulted and WSLAC subsequently foreclosed on the loans. WSLAC brought suit on the guaranties to recovery the deficiency on the loan agreements following the foreclosure, as well as other damages WSLAC asserts it is entitled to under the guaranties.

### II. FINDINGS OF FACT

The following facts have been established by a preponderance of the evidence:

#### A. General Findings

1. Plaintiff WSLAC is an Ohio corporation with its principle place of business located in Cincinnati, Ohio.[1]

2. WSLAC, through its subsidiary Eagle Reality Group ("Eagle Reality"), engages

---

1. *Testimony of Rubsam*, Transcript at 31.

in commercial real estate lending and development.[2]

3. Defendant Kaleh is a Texas resident.[3]

4. Kaleh and Paul Buchanan ("Buchanan"), a non-party to this suit, solicited an investment from WSLAC in Ohio for financing to develop a luxury apartment complex located in Texas.[4]

5. The property for which Kaleh and Buchanan sought financing is located at 4550 N. Braeswood Blvd., Houston, Texas (the "Meritage").[5]

6. David Rubsam ("Rubsam"), an assistant Vice President and Asset Management Director for Eagle Reality, negotiated the financing on behalf of WSLAC with Kaleh and Buchanan.[6] Kaleh and Buchanan directed communications to WSLAC's headquarters in Ohio, undertook negotiations in Ohio, and traveled to Ohio on multiple occasions to meet with WSLAC representatives.[7]

7. In order to secure financing from WSLAC for the Meritage, Kaleh and Buchanan signed three guaranties for the loans in their personal capacity.[8]

### B. The Underlying Loan Documents

8. Kaleh and Buchanan formed three entities for the purpose of borrowing funds to develop the Meritage: (1) Sedona Apartments, LP; (2) Sedona Apts GP, LLC; and (3) Sedona Investors, L.P(collectively, the "Borrowers").[9]

9. Sedona Apartments, LP was the borrower on the Construction Loan Agreement ("Construction Loan Agreement") and executed the Non-Revolving Credit Promissory Note ("Construction Note").[10] Sedona Apts GP, LLC and Sedona Investors, L.P. were the borrowers on the Mezzanine Loan Agreement ("Mezzanine Loan Agreement") and executed the Promissory Note ("Mezzanine Note").[11]

10. On or about November 21, 2006, the Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing ("Deed of Trust") was executed by Sedona Apartments, LP, by and through its general partner, Sedona Apt GP, LLC.[12] The Deed of Trust was recorded In Harris County real property records on December 1, 2006.[13]

11. On or about November 21, 2006, the Construction Loan Agreement, Construction Note, Mezzanine Loan Agreement, and Mezzanine Note (with the Deed of Trust, collectively, the "Loan Documents") were entered into between the Borrowers and WSLAC.[14]

12. The Loan Documents were amended ("Amended Loan Documents") on or about August 25, 2008, to reflect the addition of new borrowers on the Loan Documents. San Bernardino Design Center, LP was added as a borrower to the Construction Loan documents.[15] Meritage Apartments

2. *Testimony of Rubsam*, Transcript at 30, 32.

3. *Testimony of Rubsam*, Transcript at 37.

4. *Testimony of Rubsam*, Transcript at 35-38.

5. *Joint Pre-Trial Order*, Document No. 82· at 14.

6. *Testimony of Rubsam*, Transcript at 30, 37.

7. *Testimony of Rubsam*, Transcript at 38.

8. *Testimony of Rubsam*, Transcript at 55-57.

9. *Testimony of Rubsam*, Transcript at 40-41; Joint Exhibit 2; Joint Exhibit 3.

10. Joint Exhibit 2; Joint Exhibit 4.

11. Joint Exhibit 3; Joint Exhibit 5.

12. Joint Exhibit 1.

13. Joint Exhibit 1 at 45.

14. Joint Exhibit 2; Joint Exhibit 3; Joint Exhibit 4; Joint Exhibit 5.

15. Joint Exhibit 9.

Investors LLC, SBDC Management LLC, and Carmenere LLC were added as borrowers on the Mezzanine Loan Documents.[16]

13. The Construction Note was secured by the Deed of Trust for the Meritage Property and gave WSLAC a first lien on the Meritage Property.[17] WSLAC extended $22,738,000 to the borrowers under the Construction Loan Agreement.[18]

14. The Mezzanine Note was secured by a pledge of the ownership interests the respective borrowers had in the Meritage.[19] WSLAC extended $6,139,200 to the borrowers under the Mezzanine Loan Agreement.[20]

15. The Loan Documents and Amended Loan Documents contain a Texas choice-of-law provision.[21]

### C. The Guarantees

16. On November 21, 2006, Kaleh and Buchanan executed the following three guaranties (collectively, the "Guarantees") in their personal capacities: (1) the Guarantee of Completion, Budgets and other Matters ("Completion Guarantee")[22]; (2) the Guarantee ("Construction Loan Guarantee")[23]; and (3) the Guarantee of Payment and Performance ("Mezzanine Loan Guarantee")[24].

17. The Guarantees contain an Ohio choice-of-law clause.[25]

18. The Mezzanine Loan Guarantee is a limited recourse guarantee. Under the Mezzanine Guarantee's terms, the guarantors have no liability upon completion of the project as defined within the Mezzanine Loan Documents.[26]

19. The Mezzanine Loan Agreement lays out the terms of completion in Exhibit B to the Agreement under section 12 for the Additional Requirements for Final Loan Disbursement as to Construction Work, which identifies the terms for the final loan disbursement.[27] The following are required: (1) As-Built Survey; (2) Certificates of Occupancy; Licenses and Permits; (3) Architect's Certification; (4) Contractor's Certification; (5) Permanent Insurance; (6) Final Applications for Payment from Subcontractors; (7) Owner's Affidavit; (8) Personal Property Inventory; and (9) Affidavit of Completion.

20. The Completion Guarantee provides that "Lender shall terminate this Guarantee and it shall be of no further force and effect following completion of construction and the issuance of the Final Disbursement."[28]

### D. The Foreclosure On The Meritage Property

21. On April 16, 2009, WSLAC sent Sedona Apartments, LP, and San Bernardino Design Center, LP (collectively, "Construction Loan Borrowers"), notice of de-

---

**16.** Joint Exhibit 10.

**17.** Joint Exhibit 9.

**18.** Joint Exhibit 2.

**19.** Joint Exhibit 5, ¶ 1; Joint Exhibit, 11, ¶ 1.1; Joint Exhibit 13, ¶ B.

**20.** Joint Exhibit 5.

**21.** Joint Exhibit 1, ¶ 7.30; Joint Exhibit 4, ¶ 15; Joint Exhibit 5, ¶ 10; Joint Exhibit 9, ¶ 5.5; Joint Exhibit 10 ¶ 6.5; Joint Exhibit 12, ¶ 4; Joint Exhibit 14, ¶ 4.

**22.** Joint Exhibit 7.

**23.** Joint Exhibit 6.

**24.** Joint Exhibit 8.

**25.** Joint Exhibit 6, ¶ 8.12; Joint Exhibit 7, ¶ 9.11; Joint Exhibit 8, ¶ 8.12.

**26.** Joint Exhibit 8 at 1.

**27.** Joint Exhibit 3 at 23.

**28.** Joint Exhibit 6, ¶ 3.

fault on the Construction Note. Buchanan and Kaleh were copied on this notice.[29]

22. On April 17, 2009, WSLAC sent Sedona Apts GP, LLC, Sedona Apts Investors, L.P., Meritage Apartments Investors LLC, SBDC Management LLC, and Carmenere LLC (collectively, "Mezzanine Loan Borrowers"), notice of default on the Mezzanine Note. Buchanan and Kaleh were copied on this notice.[30]

23. On August 11, 2009, WSLAC provided notice of acceleration on the Construction Note and Mezzanine Note to the respective borrowers.[31]

24. On September 28, 2009, WSLAC foreclosed on the interests secured by the Mezzanine Note. WSLAC was the highest bidder at the foreclosure sale, with a purchase price of $1,100,000 for the collateral secured by the Mezzanine Note.[32]

25. The balance on the Mezzanine Note on September 28, 2009, at the time of foreclosure was $5,006,776.77.[33] The interest accrued on the Mezzanine Note at the time of the September 28, 2009 foreclosure was $525,016.17.[34] The total owed under the Mezzanine Note, including accrued interest, at the time of foreclosure was $5,531,792.94.

26. Following the September 28, 2009 foreclosure, WSLAC took control of the Meritage and hired Greystar Property Management to manage the property.[35]

27. On December 1, 2009, WSLAC conducted a non-judicial foreclosure of the Meritage Property.[36]

28. The balance on the Construction Note on December 1, 2009, at the time of foreclosure was $22,738,000.[37] The interest accrued on the Construction Note at the time of the December 1, 2009 foreclosure was $1,661,768.84.[38] The total owed under the Construction Note, including accrued interest, at the time of foreclosure was $24,399,768.84.

29. WSLAC purchased the Meritage Property at the December 1, 2009 foreclosure sale for the price of $18,000,000.[39]

30. The fair market value of the Meritage at the time of foreclosure was $27,400,000 as reflected in the valuation performed by WSLAC in December 2009. WSLAC undertook this valuation for purposes of placing a value on its books following the purchase of the Meritage at the December 1, 2009 foreclosure sale.[40] That valuation was calculated using the income-based valuation approach.[41] The $27,400,000 figure includes the $26,400,000 income-based valuation of the property in 2009 and a $1,000,000 credit for construction defects and lien 42 settlements.[42] The $1,000,000 credit to the property value was given so as to avoid a double recovery, as WSLAC seeks damages for those items in a different part of its claim.[43] The Court

---

29. Plaintiff's Exhibit 15.

30. Plaintiff's Exhibit 27.

31. Plaintiff's Exhibit 28; Plaintiff's Exhibit 29.

32. *Testimony of Bezold*, Transcript at 462.

33. Plaintiff's Exhibit 38, ¶ 1; *Testimony of Bezold*, Transcript at 385.

34. Plaintiff's Exhibit 38, ¶ 1.

35. *Testimony of Rubsam*, Transcript at 151.

36. Plaintiff's Exhibit 125.

37. Plaintiff's Exhibit 38, ¶ 1.

38. Plaintiff's Exhibit 38, ¶ 1.

39. Defendant's Exhibit 11 at 8.

40. *Testimony of Bezold*, Transcript at 395.

41. *Testimony of Bezold*, Transcript at 395-96.

42. Plaintiff's Exhibit 37; *Testimony of Bezold*, Transcript 408-09.

43. *Testimony of Bezold*, Transcript at 409.

finds this valuation to be the most credible measure of the Meritage's fair market value based on the evidence submitted at trial, as the valuation was done prior to any anticipated need for litigation.[44] This valuation is substantially consistent with the February 2009 Cushman and Wakefield appraisal that valued the Meritage "as is" at $26,650,000 as of February 19, 2009, and that gave a projected "stabilized" value of the property at $29,200,000 as of June 1, 2010 [45]

31. The Meritage was not complete at the time of the September 28, 2009 or December 1, 2009 foreclosures as anticipated by the terms of the Guarantees. A Certificate of Occupancy had issued in or around May 2009 prior to any foreclosure,[46] and WSLAC did not at trial contest the architect issued a certificate of substantial completion in March 2009. [47] However, no other certificates and affidavits as required by the terms of completion had yet issued.[48] At the time of foreclosure no affidavit of completion had issued.[49] Nor was any evidence given that the Final Disbursement issued, as required to release Kaleh's obligations under the Completion Guarantee [50]

32. The total outstanding and unpaid principal, and accumulated interested, on the Mezzanine Note and Construction Note on the date of the December 1, 2009 foreclosure was $29,931,562.[51]

### E. WSLAC'S Post-Foreclosure Expenditures on the Meritage

33. After purchasing the Meritage at the December 1, 2009 foreclosure sale, WSLAC made the following post-purchase expenditures:

#### 1. Post-Purchase Improvements

34. WSLAC hired Kelly McGee ("McGee"), Senior Regional Director of Capital Improvements for Greystar Capital Project Services, to serve as construction manager following the December 1, 2009 foreclosure.[52]

35. As construction manager, McGee generated a property assessment report ("Report") on January 6, 2010, detailing the condition of the Meritage.[53] McGee conducted a physical inspection of the interior and exterior conditions of the Meritage.[54] This inspection took place in December 2009 and January 2010.[55] He then produced the Report detailing renovations and potential capital projects—as well as a budget—which was then used as the scope of work for invitation to bid packages to subcontractors.[56]

36. The Report detailed three categories of needs: (1) Life/Safety; (2) Required; and (3) Recommended.[57] The total combined

---

44. *Testimony of Bezold,* Transcript at 395.

45. Plaintiff's Exhibit 14 at 3.

46. *Testimony of Bezold,* Transcript at 563.

47. *Testimony of Bezold,* Transcript at 562.

48. The Court looks to how the terms of the Guarantees define completion and not merely facts which might otherwise indicate completion absent a definition of the term in the Guarantees. *See supra* Part II.C of this Order, ¶¶ 19-20.

49. The Court notes there was no testimony indicating the affidavit of completion had issued, nor was any such document submitted into evidence.

50. Joint Exhibit 6, ¶ 3.

51. Plaintiff's Exhibit 38, ¶ 1.

52. *Testimony of Bezold,* Transcript at 447; *Testimony of McGee,* Transcript at 253–54.

53. Plaintiff's Exhibit 33.

54. *Testimony of McGee,* Transcript at 256–57.

55. *Testimony of McGee,* Transcript at 367.

56. *Testimony of McGee,* Transcript at 256-57.

57. Plaintiff's Exhibit 33 at 3-4.

costs for the needs identified in the Report were $619,981.[58]

37. In generating the Report, McGee reviewed plans for the property but had no knowledge as to whether those were the original plans for the property or the source of those plans.[59] The plans McGee reviewed were not provided to him by Tony Bezold ("Bezold"),[60] the WSLAC employee for whom the report was prepared.[61] McGee was also unaware as to when Greystar Property Managers took control of the Meritage and to what extent any property damage might be attributable to it.[62]

38. WSLAC paid at least the budgeted $619,981 for the needs identified in the Report, and the capital improvements were completed with minimal overruns on that budget.[63]

39. WSLAC would not have made the $619,981 in expenditures pursuant to the Report if another buyer had purchased the Meritage at the foreclosure sale.[64]

### 2. Lien Settlement

40. After purchasing the Meritage at foreclosure, WSLAC determined the liens that had attached to the Meritage prior to the foreclosure were not extinguished because the liens were for removables and engaged in litigation to settle those lien claims.[65]

41. At the time of foreclosure, there were nineteen contractors who had not fully been paid, resulting in liens on the Meritage in the total amount of $932,698.12.[66]

42. WSLAC paid $351,109.47 in total to settle the lien claims on the property.[67]

43. Baker Botts LLP ("Baker Botts") was retained as counsel to evaluate and negotiate the lien claims on the Meritage.[68]

### 3. Insurance Premiums

44. Prior to the September 28, 2009 foreclosure on the Mezzanine Loan, the Borrowers accumulated unpaid insurance premiums in the amount of $86,749.87.[69] The unpaid premiums were owed to four insurers.[70]

45. WSLAC paid the $86,749.87 in unpaid insurance premiums.[71]

### 4. Unpaid Taxes

46. Prior to the September 28, 2009 foreclosure on the Mezzanine Note, the Borrowers accumulated $847,372.86 in unpaid taxes, penalties, and interest.[72] This total was calculated for 2008 tax year during which the Borrowers had complete control of the property and was prorated for the 2009 tax year from when WSLAC took control of the property following the September 28, 2009 Mezzanine Note foreclosure.[73]

58. Plaintiff's Exhibit 33 at 4.

59. *Testimony of McGee,* Transcript at 335.

60. *Testimony of Bezold,* Transcript at 585.

61. Plaintiff's Exhibit 33 at 1.

62. *Testimony of McGee,* Transcript at 367.

63. *Testimony of Bezold,* Transcript at 449; *Testimony of McGee,* Transcript at 318.

64. *Testimony of Rubsam,* Transcript at 190.

65. *Testimony of Bezold,* Transcript at 427.

66. *Testimony of Bezold,* Transcript at 429-30; Plaintiff's Exhibit 54.

67. *Testimony of Bezold,* Transcript at 433-34; Plaintiff's Exhibit 57.

68. *Testimony of Bezold,* Transcript at 441.

69. Plaintiff's Exhibit 177, *Testimony of Bezold,* Transcript at 460-62.

70. Plaintiff's Exhibit 177.

71. *Testimony of Bezold,* Transcript at 469-73.

72. Plaintiff's Exhibit 178, *Testimony of Bezold,* Transcript at 475-83.

73. *Testimony of Bezold,* Transcript at 481-82.

47. WSLAC did not have knowledge that the taxes on the Meritage were unpaid and that penalties and interest had accrued until it took control of the property following the September 28, 2009 foreclosure on the Mezzanine Note.[74]

48. WSLAC paid the $847,372.86 in unpaid taxes, penalties, and interest.[75]

#### 5. Unremitted Security Deposits

49. Prior to the September 28, 2009 foreclosure on the Mezzanine Note, $20,845 in tenant security deposits had been collected.[76]

50. The security deposits collected prior to WSLAC taking control of the property were not transferred from the Borrowers to WSLAC at the time of acquisition.[77] WSLAC unsuccessfully tried to recover the funds and gain access to the accounts in which the funds were held.[78]

51. WSLAC assumed the liability for the $20,845 in unaccounted for security deposits.[79] At the time of trial, the security deposits had not be accounted for or located.[80]

#### F. The Meritage Litigation

52. WSLAC made written demands to Kaleh and Buchanah on the Guarantees on June 30, 2010.[81] The demand letter sought $4,990,976[82] in liabilities owed under the Guarantees.[83]

53. WSLAC had not, as of the date of trial, received any monetary payment from Kaleh in response to that demand.[84]

54. WSLAC filed a complaint in this Court to recover on the deficiency under the Guarantees on June 26, 2013.[85]

55. On December 1, 2014, the parties filed cross-motions for summary judgment.[86] The Court denied both motions for summary judgment on January 20, 2015.[87]

56. A five day bench trial commenced on October 5, 2015.[88]

#### G. Attorneys' Fees Accumulated In The Meritage Litigation

57. Paul Kerlin ("Kerlin"), an attorney with the firm of Vorys, Sater, Seymour and Pease LLP ("Vorys"), testified as an expert on the issue of the reasonableness of the attorneys' fees accrued.[89] Kerlin is licensed to practice law in Texas and Arkansas.[90] He is licensed to practice in all federal districts in Texas, as well as to appear in the Fifth Circuit Court of Appeals and United States Supreme Court.[91] He has been a practicing attorney for ten years, has litigated dozens of cases arising

---

**74.** *Testimony of Bezold*, Transcript at 477-78.

**75.** *Testimony of Bezold*, Transcript at 480-82.

**76.** Plaintiff's Exhibit 70.

**77.** *Testimony of Bezold*, Transcript at 485.

**78.** *Testimony of Bezold*, Transcript at 485.

**79.** *Testimony of Bezold*, Transcript at 486.

**80.** *Testimony of Bezold*, Transcript at 486.

**81.** Plaintiff's Exhibit 24.

**82.** WSLAC now seeks $5,269,321.20 in damages from Kaleh due to additional attorneys' fees incurred since the date of the demand letter. *Testimony of Bezold*, Transcript at 509.

**83.** Plaintiff's Exhibit 24.

**84.** *Testimony of Bezold*, Transcript at 509.

**85.** *Complaint*, Document No. 1.

**86.** See *Defendant George W. Kaleh's Motion for Final Summary Judgment*, Document No. 54; *Plaintiff's Motion for Summary Judgment*, Document No. 53.

**87.** *Order*, Document No. 67.

**88.** *Courtroom Minutes*, Document No. 93.

**89.** *Testimony of Kerlin*, Transcript at 600.

**90.** *Testimony of Kerlin*, Transcript at 601.

**91.** *Testimony of Kerlin*, Transcript at 601.

out of commercial loan foreclosures, and has litigated materialmen and contractors' liens and breach of guaranty cases.[92] Kerlin received his law degree from South Texas College of Law and has previously testified regarding the reasonableness of attorneys' fees by affidavit in about ten cases.[93]

58. In preparation for his testimony, and in addition to reviewing the documents showing the attorneys' fees incurred, Kerlin spoke with Bezold about the matters for which WSLAC retained the various law firms.[94]

59. Baker Botts handled the Construction Note foreclosure, negotiated the settlement of the lien claims, defended lien suits filed by contractors and materialmen working on the Meritage, and obtained a dismissal in a bankruptcy filing by one of the Borrowers.[95]

60. From September 24, 2009, through December 19, 2011, WSLAC incurred $269,158.65 in fees from Baker Botts.[96]

61. Kerlin testified, in his opinion, a reasonable hourly rate for the Baker Botts legal services was $270 based on the Texas State Bar sheet for 2011.[97] He also testified—given his experience—that in his opinion, 1000 to 1200 hours was a reasonable number of hours based upon the complexity of the documents involved in the nonjudicial foreclosure, the mechanics and materialman's lien suits and settlements, and the bankruptcy case.[98] Therefore, in Kerlin's opinion, fees between $270,000-$324,000 were reasonable for the work done by Baker Botts and the $269,158,65 WSLAC paid in fees was reasonable.[99]

62. Kerlin did not have knowledge of the hourly rate that Baker Botts charged WSLAC.[100] Kerlin also did not review any invoices actually produced by Baker Botts, only the summary of the invoices prepared by Bezold.[101] Nor did Kerlin have knowledge of the number of lawyers and paralegals Baker Botts used in connection with the various Meritage legal matters it worked on.[102]

63. Frost Brown Todd LLC ("Frost Brown Todd") handled the Mezzanine Loan Foreclosure and litigation involving a fraudulent transfer case involving a Borrower filed in Ohio.[103]

64. From September 16, 2009, through October 11, 2010, WSLAC incurred $70,777.82 in fees from Frost Brown Todd.[104]

65. Kerlin testified, in his opinion, that a reasonable hourly rate for the Frost Brown Todd legal services was $245 based on the Ohio State Bar 2010 triennial survey.[105] He also testified—given his experience—that in his opinion. 400 hours was a reasonable number of hours based upon

---

**92.** *Testimony of Kerlin,* Transcript at 600, 602-03.

**93.** *Testimony of Kerlin,* Transcript at 602, 604.

**94.** *Testimony of Kerlin,* Transcript at 614.

**95.** *Testimony of Kerlin,* Transcript at 615-23.

**96.** *Testimony of Kerlin,* Transcript at 612; Plaintiff's Exhibit 40.

**97.** *Testimony of Kerlin,* Transcript at 624.

**98.** *Testimony of Kerlin,* Transcript at 624.

**99.** *Testimony of Kerlin,* Transcript at 624-25.

**100.** *Testimony of Kerlin,* Transcript at 663.

**101.** *Testimony of Kerlin,* Transcript at 660; Plaintiff's Exhibit 172 at 2.

**102.** *Testimony of Kerlin,* Transcript at 663.

**103.** *Testimony of Kerlin,* Transcript at 625-27.

**104.** *Testimony of Kerlin,* Transcript at 612; Plaintiff's Exhibit 40.

**105.** *Testimony of Kerlin,* Transcript at 627-28.

the complexity of the documents involved in the nonjudicial foreclosure and the fraudulent transfer action filed in Hamilton County, Ohio.[106] Therefore, in Kerlin's opinion, fees between $73,500-$98,000 were reasonable for the work done by Frost Brown Todd and the $70,077.82 WSLAC paid in fees was reasonable.[107]

66. Kerlin did not have knowledge of the hourly rate that Frost Brown Todd charged WSLAC.[108] Nor did Kerlin have knowledge of the number of lawyers and paralegals Frost Brown Todd used in connection with the various Meritage legal matters on which it worked.[109]

67. Vorys handled the instant litigation to enforce the terms of the written Guarantees and recover for the breach thereof.[110]

68. From January 1, 2013, through May 31, 2015, WSLAC incurred $472,419.53 in fees from Vorys.[111]

69. Kerlin, Eric Richardson ("Richardson"), and Aaron Stucky("Stucky") are counsel at Vorys and were retained by WSLAC on the instant matter. Kerlin's services are billed per hour at a rate of $425, Richardson's at $350, and Stucky's $190.[112]

70. Kerlin did not have knowledge as to exact number of hours that he, Richardson, or Stucky had spent on the matter.[113]

He did testify that as of May 31, 2015, Vorys as a whole had spent 1809 hours on the matter.[114] Kerlin had no knowledge of how many Vorys paralegals had worked on the matter.[115] Nor did Kerlin have knowledge as to which attorneys did which item of work, although he testified four attorneys primarily worked on the matter.[116] In preparation for testifying, Kerlin did not review any detailed itemized statements, only the total number of hours billed and timekeepers, as well as the summary in Plaintiff's Exhibit 172.[117]

71. Kerlin testified since Vorys billed WSLAC $2,000 for eight hours in preparation for trial from May 31, 2015 through August 2015.[118] Additionally, he estimated that 200 hours were spent in preparation for and on trial between September 1, 2015, and October 9, 2015.[119] With an hourly billing rate of $278, Kerlin estimated $55,600 in additional fees were incurred, as well as $15,000 in costs.[120] Kerlin then testified he anticipated 150 hours would be billed at a conservative rate of $278, for a total of $41,700 in additional fees if there was an appeal.[121] The total fees through an appeal, in Kerlin's opinion, would be $925,956.[122]

72. WSLAC paid, in total, $811,656 in attorneys' fees though May 31, 2015, in the instant and underlying litigation involving

---

106. *Testimony of Kerlin*, Transcript at 628-29.

107. *Testimony of Kerlin*, Transcript at 629.

108. *Testimony of Kerlin*, Transcript at 663.

109. *Testimony of Kerlin*, Transcript at 663.

110. *Testimony of Kerlin*, Transcript at 630.

111. *Testimony of Kerlin*, Transcript at 639-640.

112. *Testimony of Kerlin*, Transcript at 654-55.

113. *Testimony of Kerlin*, Transcript at 655.

114. *Testimony of Kerlin*, Transcript at 655.

115. *Testimony of Kerlin*, Transcript at 656-57.

116. *Testimony of Kerlin*, Transcript at 657.

117. *Testimony of Kerlin*, Transcript at 657-58.

118. *Testimony of Kerlin*, Transcript at 647.

119. *Testimony of Kerlin*, Transcript at 648.

120. *Testimony of Kerlin*, Transcript at 648-49.

121. *Testimony of Kerlin*, Transcript at 649-50.

122. *Testimony of Kerlin*, Transcript at 651.

the Meritage to the firms of Baker Botts, Frost Brown Todd, and Vorys.[123]

74. No itemized billing records for any firm were submitted into evidence. The evidence only contains a summary of the invoices paid to Baker Botts and Frost Brown Todd,[124] and the remittance statements from Vorys.[125] The remittance statements from Vorys only indicate the amount invoiced but contain no itemization from which to determine what work was done and by whom, or the hours spent on those matters.

74. During discovery, Kaleh did not request production of billing statements or narratives for fees WSLAC incurred from Baker Botts, Frost Brown Todd, or Vorys.[126]

### III. CONCLUSIONS OF LAW

#### A. General Findings Of Law

1. The Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332. 28 U.S.C. § 1332(a). Kaleh is resident of Texas and WSLAC is an Ohio resident. More than $75,000 is in controversy. Therefore, this Court has jurisdiction.

2. Texas substantive law applies to this diversity action. *See Am. Nat'l Gen. Ins. Co. v. Ryan,* 274 F.3d 319, 328 (5th Cir. 2001).

#### B. Choice-of-Law

##### 1. The Choice-of-Law Provision In The Guarantees Controls

3. Under Texas law, parties may include a choice-of-law provision in a contract. *Chase Manhattan Bank, N.A. v. Greenbr-*

iar N. *Section II,* 835 S.W.2d 720, 723 (Tex.App.—Houston [1st Dist.] 1992, no writ). However, the jurisdiction chosen to govern the contract must bear some relation to the parties or to the agreement. *Id.*

4. Here, the parties do not contest that a contract can include a choice-of-law provision or the validity of the provisions in the Guarantees and Amended Loan Documents. Instead, the parties contest whether the choice-of-law provision in the Guarantees or the provision in the Amended Loan Documents governs this action.

5. The Court made a preliminary ruling at the outset of trial that the choice-of-law provision in the Guarantees, and not the choice-of-law provision in the Amended Loan Documents, controls in this case.[127]

6. The Guarantees were signed in Kaleh's personal capacity. The Loan Documents and the Amended Loan Documents were signed by Kaleh in his capacity as representative of the signatory entities to those documents.

7. The Guarantees contain an Ohio choice-of-law clause. The Loan Documents and Amended Loan Documents contain a Texas choice-of-law clause.

■ 8. Although Kaleh contends the Texas choice-of-law clause in the Amended Loan Documents applies because those are the latest signed documents, the Court finds the Amended Loan Documents do not alter the terms of the Guarantees. The Amended Loan Documents were only signed by Kaleh in his representative capacity for the various signatory entities. The Guarantees were signed by Kaleh in his personal capacity. The Amended Loan

---

**123.** *Testimony of Bezold,* Transcript at 487; Plaintiff's Exhibit 172.

**124.** Plaintiff's Exhibit 40.

**125.** Plaintiff's Exhibit 41; Plaintiff's Exhibit 42.

**126.** *Testimony of Kerlin,* Transcript at 630-33.

**127.** *See* Transcript at 5 (stating the Court would apply Ohio substantive law and Texas's statute of limitations).

Documents do not include the Guarantees in the definition of the documents being amended. Although the Loan Documents, Guarantees, and Amended Loan Documents at various times collectively refer to themselves as "Loan Documents," each set of agreements has a different definition of what is meant by that term.[128] Kaleh contends the Guarantees refer to themselves as "Loan Documents" and the Amended Loan Documents refer to "Loan Documents"; however, absent a definition in the Amended Loan Documents that explicitly includes the Guarantees, the Court does not interpret the term "Loan Documents" in the Amended Loan Documents to include the Guarantees. The Guarantees were signed by a non-party to the Amended Loan Documents, and as such, a subsequent agreement between WSLAC and a non-party to the Guarantees will not amend the Guarantees. Accordingly, the Ohio choice-of-law clause controls this action because the Amended Loan Documents did not alter the Guarantees' terms.

9. The Court also finds that there is sufficient contact with the state of Ohio such that an Ohio choice-of-law clause can govern this action. WSLAC is an Ohio corporation. WSLAC was solicited in Ohio to finance the Meritage's development. Kaleh traveled to Ohio and engaged in negotiations with WSLAC in Ohio. Accordingly, there is sufficient contact by the parties with Ohio for the law of that jurisdiction to govern the Guarantees.

### 2. Ohio Substantive Law And Texas's Statute of Limitations Applies

10. Having determined the Ohio choice-of-law clause in the Guarantees controls,

the Court turns to Kaleh's contention that Texas procedural law applies even if the Ohio choice-of-law clause is controlling. WSLAC contends that both Ohio procedural and substantive law should apply under the choice-of-law provision, even though it filed suit in Texas and in federal court.

11. The relevant choice-of-law provision states; "This Guarantee has been delivered and accepted at and will be deemed to have been made at Cincinnati, Ohio, and will be interpreted and the rights and liabilities of the parties hereto determined in accordance with the laws of the state of Ohio, without regard to conflicts of law principles."[129]

12. The Court finds under this provision, the parties determined that Ohio law would govern the Guarantees.

13. However, WSLAC brought suit to enforce the Guarantees in Texas in federal court pursuant to diversity jurisdiction.[130] "[I]n diversity lawsuits, a federal court is ordinarily bound to look to the choice of law rules of the state in which it sits to determine whether the state courts of that state would apply their own state's statute of limitations or the statute of limitations of some other state." *Ellis v. Great Southwestern Corp.*, 646 F.2d 1099, 1103 (5th Cir.1981).

14. In Texas, where parties contractually agree to apply the law of another state, the courts apply the substantive law of the contractually-chosen state but apply the law of the forum state to matters of remedy and procedure. *Illinois Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 532

---

128. Joint Exhibit 6, ¶ B: Joint Exhibit 7, ¶ A; Joint Exhibit 8 at 1; Joint Exhibit 9, ¶ 1.1; Joint Exhibit 10, ¶ 1.1; Joint Exhibit 11, ¶ 1.1; Joint Exhibit 12, ¶ 1.1; Joint Exhibit 14, ¶ A.

129. Joint Exhibit 6, ¶ 8.12; Joint Exhibit 7, ¶ 9.11; Joint Exhibit 8, ¶ 8.12.

130. Having brought suit in Texas, the validity of any choice-of-law provision is first analyzed under Texas law. The scope of its enforceability, as to whether it would govern both procedure and substantive law, would be determined under Texas law.

(Tex.App.—Houston [14th Dist.] 2006, no pet.).

**15.** Under Texas law, the statute of limitations is ordinarily a procedural issue. *Hill v. Perel*, 923 S.W.2d 636, 639 (Tex. App.—Houston [1st Dist.] 1995, no writ); *see also In re BP p.l.c. Securities Litigation*, 51 F.Supp.3d 693, 697 (S.D.Tex.2014) (Ellison, J.). "Only when the very statute that created a right of action incorporates an express limitation upon the time within which the suit could be brought is the statute of limitations considered substantive." *Hill*, 923 S.W.2d at 639.

**16.** Federal courts sitting in diversity look to the forum state to determine which statute of limitations to apply. The claims in this case are based on a breach guaranty claim under Ohio law. A Texas court would first look to whether there was a substantive statute of limitations expressly incorporated into the Ohio law creating the right of action. The Ohio breach of guaranty claim does not incorporate an express statute of limitations.[131] As a statute of limitations is not an express provision in the cause of action creating the right to suit, there is no governing substantive statute of limitations under Ohio law. Texas would then apply its procedural statute of limitation in this action. Accordingly, as the Court is sitting in diversity, it finds Texas would respect the parties' choice of Ohio substantive law, but that Texas's statute of limitations governs the action because there is no substantive limitations period in the Ohio breach of guaranty claim.[132]

### C. Breach Of Guaranty Claim

**17.** As Ohio substantive law applies, the breach of guaranty claim is analyzed in accordance with Ohio law.

**18.** The elements of a breach of guaranty claim under Ohio law are as follows: "(1) the existence of a contract; (2) performance by the plaintiff; (3) nonperformance by the defendant; and (4) damages as a result." *Strategy Group for Media v. Lowden*, No. 12 CAE 03 0015, 2013 WL 1343614, at *9 (Ohio Ct.App.2013). WSLAC bears the burden to establish each element by a preponderance of the evidence. *See Hawkins v. Green*, No. 96205, 2011 WL 4599897, at *2 (Ohio Ct. App.2011).

**19.** The elements of a breach of guaranty claim are satisfied by a preponderance of the evidence. The Guarantees are valid contracts. WSLAC performed under those contracts. WSLAC agreed to extend financing to the borrowing entities who were signatories to the Loan Documents on the condition that Kaleh signed the Guarantees in his personal capacity. There is no dispute that those funds were disbursed to the borrowing entities under the terms of the Loan Agreement. Kaleh breached the terms of the Guarantees by refusing to repay WSLAC as he was obligated to do under the terms of the agreement. Nor were these funds paid by any other guarantor. The breach resulted in damages to WSLAC, as detailed *infra* Part III.E.

**20.** Although the Mezzanine Loan Guarantee is limited recourse,[133] the Court would have to undertake a conflict of laws analysis to determine whether under Ohio's choice-of-law provisions it would apply its law or the law of Texas to this action. The Court also notes that neither party has advanced an argument as to what effect that phrase should have on this action.

---

**131.** *See infra* Part III.C ¶ 18.

**132.** The Court notes it interprets the phrase "without regard to conflicts of laws principles" in the choice-of-law clause, *supra* Part III.B.2 ¶ 11, to mean that Ohio law should govern the action regardless of whether under Ohio's conflict of laws principles Ohio would apply its law to the action. Without that phrase in the choice-of-law clause the Court

**133.** Joint Exhibit 8, ¶ 1.

found the Meritage was not complete as contemplated by the terms of the agreement at the time of foreclosure. Therefore, the Mezzanine Loan Guarantee was still in effect at the time of the September 28, 2009 foreclosure, as were the Completion Guarantee and the Construction Loan Guarantee.[134] Accordingly, the Court finds that Kaleh breached the three Guarantees and WSLAC prevails on its breach of guaranty claim as to all three Guarantees.[135]

### D. Applicability Kaleh's Defenses

21. WSLAC contends that Kaleh waived his defenses in the Guarantees. Kaleh contends the waiver of defense provision at issue is too general to waive any statute of limitations defense. Furthermore, Kaleh asserts the waiver does not purport to waive any defenses the guarantor has against the borrower.

22. Kaleh asserts the following defenses:

a. The action is barred by the statute of limitations found in Texas Property Code § 51.003(a).

b. As to damages, Kaleh asserts the following defenses[136]:

i. Kaleh was entitled to an offset on the deficiency.

ii. WSLAC cannot recover any post-foreclosure improvement expenditures because when it purchased the property at the foreclosure sale it took the property "as is"—same as any other third-party purchaser.

iii. WSLAC is not entitled to recover any funds it paid to settle lien claims because those claims were extinguished at the time of foreclosure, and therefore, any payment of them was voluntary.

iv. WSLAC is not entitled to recover attorneys' fees as it did not produce evidence sufficient to prove these damages. Additionally, Kaleh asserts even if sufficient evidence was produced, the amount charged by WSLAC's counsel is unreasonable and was unnecessarily incurred.

v. WSLAC would be unjustly enriched by the award of more than nominal damages.

### 1. Kaleh Did Not Waive His Defenses

23. The waiver of defense provision at issue reads as follows: "No setoff, counterclaim, reduction or diminution of any obligation, or any defense of any kind or nature, that Guarantor has or may have in the future against Borrower, or that Borrower has or may have in the future against Lender, will be available hereunder to Guarantor against Lender."[137]

24. The title of this paragraph in each of the Guarantees is "Subrogation and Subordination." These sections do not define the contours of the guarantor-lender relationship. Instead, these sections define the rights and responsibilities of the guarantor as to his relationship with the borrower and any rights of the lender vis-à-vis the guarantor-borrower relationship.

---

**134.** The Mezzanine Loan Guarantee secured the obligations on the Mezzanine Loan Agreement. The Construction Loan Guarantee secured the obligations on the Construction Loan Agreement. The Completion Guarantee secured the obligations on the Construction Loan Agreement.

**135.** Many of the damages WSLAC seeks to recover under the Guarantees are recoverable under the terms of all three of the Guarantees. Therefore, in the forthcoming analysis—

unless otherwise noted—any finding of damages by the Court should be interpreted as equally recoverable under any of the three breach of guaranty claims.

**136.** As the Court finds Kaleh did not waive his defenses, *infra* Part III.D.1, the applicability of these defenses are addressed in the Damages analysis, *infra* Part III.E.

**137.** Joint Exhibit 6, ¶ 6; Joint Exhibit 7, ¶ 7; Joint Exhibit 8, ¶ 6.

■ 25. Specifically, the waiver of defense provision does not waive any defenses the guarantor has against the lender. The waiver of defense provision (1) waives defenses the guarantor has against · the borrower and (2) waives the availability to the guarantor of any defenses the borrower has against the lender. Therefore, under the waiver's plain language, it does not purport to waive any defenses that might be independently available to the guarantor against the lender. Here, Kaleh is the guarantor and WSLAC is the lender. This provision only limits Kaleh's availability to assert a defense against one of the borrowing entities or to assert a defense the borrowing entity has against WSLAC to excuse his obligations as a guarantor. Accordingly, the Court finds that Kaleh did not waive his defenses against WSLAC.[138]

## 2. Suit Was Timely Filed

26. The Court found that this action is governed by the Texas statute of limitations.[139]

27. The parties contest under Texas law which statute of limitations applies to this action. Kaleh contends that Texas Property Code § 51.003(a) applies and that all damages are barred in this action because WSLAC only had two years to bring suit on the deficiency. WSLAC disputes the applicability of § 51.003(a) because it contends the statute is substantive, not procedural. Furthermore, if § 51.003(a) does apply, WSLAC contends not all damages are barred by the statute and disputes Kaleh's

definition of the term deficiency. However, WSLAC contends the action is timely because Texas Civil Practice and Remedies Code § 16.004(a)(3) applies and suit was filed within the four-year period.

### a. Section 51.003(a) is substantive

28. WSLAC contends that the two-year period of limitations in Texas Property Code § 51.003(a) is part of a unified statutory scheme and thus is substantive and inapplicable. Kaleh contends . the limitations period in § 51.003(a) is procedural, and therefore, is the controlling limitations period for this action,

29. Section 51.003(a) states: "If the price at which real property is sold at a foreclosure sale under Section 51.002 is less than the unpaid balance of the indebtedness secured by the real. property, resulting in a deficiency, any action brought to recover the deficiency must be brought within two years of the foreclosure sale and is governed by this section." TEX. PROP. CODE § 51.003(a).

■ 30. In determining "whether a statute is procedural or substantive, [Texas courts] apply Texas rules of construction." *Owens–Corning Fiberglas Corp. v. Martin*, 942 S.W.2d 712, 721 (Tex.App.— Dallas 1997, no writ). In Texas, statutes of limitations are procedural unless the limitations period is expressly contained in the statute giving right to the . cause of action.[140]

---

**138.** WSLAC also argues the Loan Documents specifically waive any statute of limitation defense; however, WSLAC has not sued the borrowing entities for a breach of the loan agreement, but has sued Kaleh in his personal capacity for a breach of the Guarantees. Therefore, any waiver in the Loan Documents is . not applicable here, where the rights of WSLAC and Kaleh are only defined by the corners of the Guarantees, except to the extent any terms of the Loan Agreements are incorporated by reference.

**139.** *See supra* Part III.B.2. If, however, the Ohio statute of limitations applied, this action would also be timely. Under Ohio law, a party has eight years to bring suit on a contract. OHIO REV. CODE § 2305.06. Suit was filed in June 2013, and although the parties contest when the action accrued, there is no dispute the earliest the action could have accrued was April 2009. Therefore, suit would be timely.

**140.** *See supra* Part III.2.d ¶ 15.

31. Section 51.003(a) is an anti-deficiency statute. *See Moayedi v. Interstate 35/Chisam Road, L.P.*, 438 S.W.3d 1, 6 (Tex.2014). The two-year limitations period to sue on the deficiency is expressly contained within the subsection of the statute creating the right to sue to recover the deficiency. *See* Tex. Prop. Code § 51.003(a). As such, the limitations period is expressly incorporated in the statute creating the right to sue under Texas law. Therefore, under Texas rules of construction, § 51.003(a) is a substantive statute.

32. As the Court has determined this action is governed by Ohio substantive law, Texas substantive law does not apply in this action. Section 51.003(a) is a substantive statute. Accordingly, the substantive limitations period contained in § 51.003(a) does not apply in this action.

### b. Suit was timely under Texas Civil Practice and Remedies Code § 16.004(a)(3)

33. As § 51.003(a) is a substantive statute, and therefore not applicable because the suit is governed by Ohio substantive law, the relevant statute of limitations for this action is found in Texas Civil Practice and Remedies Code § 16.004(a)(3).[141]

34. Under § 16.004(a)(3), a person bringing suit on debt must do so "not later than four years after the day the cause of action accrues." Tex. Civ. Prac. & Rem. Code § 16.004(a)(3). Section 16.004(a)(3) is procedural statute of limitations under Texas law because it is not a limitations period expressly incorporated into a statute giving rise to a right of action. As the Court has determined the Texas statute of limitations would apply in this action, § 16.004(a)(3) is the controlling limitations period.

35. "When the legislature employs the term 'accrues' without an accompanying definition, the courts must determine when that cause of action accrues and thus when the statute of limitations commences to run." *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 351 (Tex.1990). "For purposes of the application of limitation statutes, a cause of action can generally be said to accrue when the wrongful act effects an injury, regardless of when the plaintiff learned of such injury." *Id.*

36. The Construction Loan and Completion Guarantees required that written demand be made on Kaleh prior to liability on the obligations being incurred.[142]

---

141. Kaleh has not directed the Court to any limitations period in any Ohio anti-deficiency law that might apply here. Under Texas law, if the parties contract to apply foreign law, there is no fundamental policy that would be offended by applying a materially different anti-deficiency law that would effectively destroy a party's anti-deficiency rights. *Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 279–80 (Tex.App.—Houston [1st Dist.] 2004, pet. dism'd). As such the Court finds no fundamental policy of Texas would be offended by the contractual application of Ohio substantive law, which in this action has the practical effect of waiving a defense available to Kaleh under Texas anti-deficiency law.

142. Joint Exhibit 6, ¶3: "[U]pon 10 days written notice to Guarantor. Guarantor shall pay to Lender the amount of the Liabilities."; Joint Exhibit 7, ¶¶ 4, 9: In writing the Lender "will notify the Guarantor thereof, and Guarantor will immediately make payment to Lender in such amount." *But see* Joint Exhibit 8, ¶¶ 5, 8.2: All demands will be in writing, however "[i]mmediately and automatically upon any Event of Default (without demand or notice of any kind, which demand or notice are hereby expressly waived), Guarantor will pay to Lender all amounts due and to become due under the Obligations." Even if demand was not required under the Mezzanine Loan Guarantee's terms, the respective default on the underlying loan did not occur until the foreclosure on September 28, 2009. Accordingly, suit would have still been timely filed as to any obligations breached on the Mezzanine Loan Guarantee.

37. WSLAC's suit was timely under § 16.004(a)(3). Suit was commenced on June 26, 2013. It is undisputed that demand was made to Kaleh on the Guarantees on June 30, 2010, and that Kaleh has made no payment on those demands within the time to do so under the Guarantees' terms. WSLAC is suing for a breach of the Guarantees. Thus, the wrongful act giving rise to the injury did not occur until the demands on the Guarantees were made and refused. That occurred June 30, 2010. Filing suit on June 26, 2013, was therefore within the four-year limitations period. Accordingly, the Court finds suit was timely filed.

## E. Calculation of Damages

38. Having found that WSLAC prevails on its breach of guaranty claims and that this action is not barred by the statute of limitations, the Court turns to the calculation of damages.

### 1. The Deficiency

■ 39. WSLAC contends it is entitled to recover the deficiency owed under both the Mezzanine Loan Agreement and the Construction Loan Agreement in the amount of $2,531,562. This amount was calculated using the difference between the outstanding balance of the principal and interest owed on the Construction Note and Mezzanine Note, in the amount of $29,931,562, and the value of the Meritage as of the December 2009 foreclosure, in the amount of $27,400,000.

40. The Court found based on the evidence submitted, and after weighing the testimony of Tony Bezold and Kaleh's expert, Christopher Stallings, at trial, that the fair market value of the Meritage at the time of the December 1, 2009 foreclosure was $27,400,000. At that time, $5,531,792.94 was owed on the Mezzanine Note and $24,399,768.84 on the Construction Note, in principle and interest. The total amount owed on the Notes was $29,937,561.78.[143] The deficiency is calculated based on the fair market value of the Meritage and the amounts owed under the Notes as secured by the Meritage. Therefore, the resulting deficiency on the amounts owed under the Notes—which were secured by the Meritage property and various ownership interests in the Meritage—was $2,537,561.78.

41. Kaleh contends he is entitled to an offset. However, the anti-deficiency provision that he asserts entitles him to an offset under is § 51.003.[144] The Court has already determined the anti-deficiency provisions in § 51.003 are substantive. Thus, those provisions do not apply, as the action is governed by Ohio substantive law.

42. Accordingly, as Kaleh has not showed he is entitled to an offset or any other defense under Ohio law, the Court finds damages in the amount of $2,537,561.78 for the deficiency on the Notes secured by the Guarantees.

---

143. Kaleh contends the Mezzanine Loan Guarantee was limited recourse and he had no ongoing liability under the Guarantee once the Meritage was complete. However, the Court found under the terms of the Guarantees and Loan Agreements, the Meritage was not complete at the time of foreclosure on the Mezzanine Note. See supra Part II.D ¶ 31, Two of the documents needed for completion under the terms of the agreements had issued at the time of foreclosure; however, no evidence was submitted showing the other documents required for completion had been submitted at the time of the foreclosure on the Mezzanine Note.

144. Additionally, Kaleh cites to PlainsCapital Bank v. Martin, 459 S.W.3d 550 (Tex.2015), to support the proposition that a court can take into account future sales prices when determining fair market value. However, PlainsCapital is also interpreting specific provisions in § 51.003.

## 2. Post-Purchase Expenditures

43. WSLAC contends under the terms of the Completion Guarantee it is entitled to recover $691,981 for what it alleges were construction defects.

44. The relevant paragraph of the Completion Guarantee holds the guarantor liable: "[E]xcept as may be excused by an event of force majeure, on or before the Completion Date, [if] the Project is not fully completed in accordance with the Plans and Specifications and the other provisions of the Loan Agreement, including without limitation the requirements of Section 4.13 of the Loan Agreement, and in conformity with existing zoning and other laws, ordinances and regulations, and restrictions of record. . . ."[145]

45. The Completion Guarantee also required that "the total development costs [not exceed] the Development Budget."[146]

46. Kaleh contends that the obligation to pay for construction defects stems from the Deed of Trust and is barred by the limitations in § 51.003(a). However, as addressed *supra* Part III.D.2.a, § 51.003(a) is not applicable in this action.

47. The Court finds that WSLAC failed to produce sufficient evidence at trial that the post-foreclosure improvements were guaranteed by Kaleh under the terms of the Completion Guarantee. Kaleh was only liable for completion of the project as anticipated by the "Plans and Specifications." WSLAC failed to prove at trial that the post-foreclosure improvements were required by the Plans and Specifications, as necessary to show liability under the Completion Guarantee.

48. The evidence introduced at trial showed that McGee, Senior Regional Director of Capital Improvements for Greystar Capital Project Services, served as construction manager for the Meritage following WSLAC's December 2009 purchase of the property. In his role, McGee prepared a January 6, 2010 report that detailed various construction defects and needed improvements. McGee testified that he saw plans but he was unaware as to whether those were the original plans for the site. McGee also testified he "saw some plans on the property,"[147] but for some areas he made recommendations, "the plans that [he] saw didn't have any recommendations at all for that area."[148] Bezold also testified he had not provided McGee with construction plans and did not know whether McGee had the plans.[149]

49. Kaleh's liability under the Completion Guarantee was limited to completion as anticipated by the "Plans and Specifications and the other provisions of the Loan Agreement." Without evidence at trial as to what those plans and specifications were, or proving McGee had knowledge of the plans and specifications referenced in the Completion Guarantee, WLSAC fails to prove that Kaleh can be liable for the expenses WLSAC incurred as a result of McGee's report.[150]

145. Joint Exhibit 6, ¶ 2.1.

146. Joint Exhibit 6, ¶ 2.5.

147. *Testimony of McGee*, Transcript at 335.

148. *Testimony of McGee*, Transcript at 335.

149. *Testimony of Bezold*, Transcript at 585.

150. Additionally, the Court finds that WSLAC failed to prove at trial any deterioration or neglect of the Meritage that required remedying occured prior to WSLAC taking possession of the property in September 2009. McGee did not do an evaluation of the Meritage's condition until December 2009 and January 2010. *Testimony of McGee*, Transcript at 367. McGee was unaware of whether any deterioration or neglect could be attributed to WSLAC's prior property manager, Greystar Property Management, as he was unaware of when, it took over management. *Testimony of McGee*, Transcript at 367.

50. The Court also finds that even if WSLAC had produced sufficient evidence at trial showing the Kaleh was liable for the expenditures under the Completion Guarantee's terms, WSLAC made those expenditures in its role as a third-party purchaser of the property. Although the Guarantees are governed by the Ohio choice-of-law clause, WSLAC's purchase of the Meritage at a foreclosure sale was not governed by the terms of the Guarantees. Instead, WSLAC's purchase of the Meritage at the December 1, 2009 foreclosure would be governed by Texas law. Under Texas law, a third-party buyer at a foreclosure sale takes the property "as-is." TEX. PROP. CODE § 51.009(a). The testimony at trial shows that WSLAC made these expenditures in their role as the buyer of the Meritage because if another buyer had purchased the Meritage at the foreclosure sale WSLAC would not have incurred those costs.[151]

51. Accordingly, the Court finds that WSLAC incurred the costs in its role as a third-party buyer. Additionally, WSLAC failed to prove by a preponderance of the evidence that the $619,981 in costs WSLAC incurred for repairs and improvements resulted from Kaleh breaching the Completion Guarantee's terms.

### 3. Lien Settlements

52. The Completion Guarantee provides that Kaleh complete the Meritage free and clear of liens.[152]

53. Under Texas law, liens on removables survive foreclosure and the items may be removed from the property following foreclosure.[153] "[M]echanic's and materialman's liens on removable improvements take priority over a deed of trust lien ... even if the deed of trust was recorded before the inception of the mechanic's liens," *Dorsett Bros. Concrete Supply, Inc. v. Safeco Title Ins. Co.*, 880 S.W.2d 417, 423 (Tex.App.—Houston [14th Dist.] 1993, pet. denied).

54. The evidence submitted detailing the liens shows by a preponderance of the evidence the liens were for removable items.[154] WSLAC also engaged Baker Botts as counsel to determine which lien claims were for removables and to engage in the settlement process. The Court finds WSLAC had a good faith belief the liens it paid to settle survived the foreclosure process under Texas law. WSLAC paid $351,209.47 to settle the liens it determined survived foreclosure. Kaleh was obligated to deliver the property clear of any liens under the terms of the Completion Guarantee. Accordingly, the Court finds under the terms of the Completion Guarantee, WSLAC was damaged in the amount of $351,209.47 to settle liens.

### 4. Insurance Premiums

55. WSLAC contends it is entitled to $86,749.87 in unpaid insurance premiums under the terms of the Guarantees.[155]

**151.** *Testimony of Rubsam*, Transcript at 190.

**152.** The Completion Guarantee lists Kaleh's Guaranty Obligations to include completing the Project "free and clear of any and all claims for labor and services performed or material furnished in connection with the construction and completion of Project." Joint Exhibit 6, ¶ 2.1.

**153.** While the claims under the Guarantees may be contractually governed by Ohio law, there was no evidence that indicates the validity of the lien agreements should be evaluated under anything but Texas law.

**154.** Plaintiff's Exhibit 50; Plaintiff's Exhibit 54.

**155.** Joint Exhibit 8, ¶ 1.1.7; Joint Exhibit 7, ¶¶ 3.7-3.9.

56. The evidence submitted shows WSLAC paid a total of $86,749.87 in unpaid insurance premiums the Borrowers were obligated to pay to four different insurers.[156]

57. Kaleh contends that the obligation to pay insurance premiums stems from the Deed of Trust and is barred by the limitations in § 51.003(a). However, as addressed *supra* Part III.D.2.a, § 51.003(a) is not applicable in this action.

58. Accordingly, the Court finds under the terms of the Construction Loan Guarantee and the Mezzanine Loan Guarantee, WLSAC was damaged in the amount of $86,749.97 for unpaid insurance premiums.

### 5. Unpaid Property Taxes

59. WSLAC contends it is entitled to $847,373 for unpaid real estate taxes, penalties, and interest under the terms of Guarantees.[157]

60. The evidence submitted shows WSLAC paid a total of $847,373 in unpaid taxes, penalties, and interest the Borrowers failed to pay during the 2008 tax year and the prorated 2009 tax year for the period during which the Borrowers had control.[158]

61. Kaleh contends that the obligation to pay the ad valorem taxes and assessments stems from the Deed of Trust and is therefore barred by § 51.003(a). However, as addressed *supra* Part III.D.2.a, § 51.003(a) is not applicable in this action. Kaleh also contends the claim accrued in February 2009 and the four-year limitations period in § 16.004(a)(3) also bars the

claim. However, the Court found the evidence shows WSLAC was not aware of the delinquent taxes until foreclosure on the Mezzanine Loan interest in September 2009.[159] Therefore, the Court finds the claim for the unpaid taxes was timely.

62. Accordingly, the Court finds under the terms of the Construction Loan Guarantee and the Mezzanine Loan Guarantee, WLSAC was damaged in the amount of $847,373 for unpaid taxes, penalties, and interest.

### 6. Tenant Security Deposits

63. WSLAC contends the Kaleh owes $20,845 in misappropriated tenant security deposits under the terms of the Guarantees.[160]

64. The evidence submitted shows there was a total of $20,845 in tenant security deposits through September 2009 that were not remitted to WSLAC upon foreclosure on the Mezzanine Note.[161] Those security deposits remain unaccounted for and WSLAC assumed the liability for those deposits.[162]

65. Kaleh contends that the obligation to return rents and security deposits stems from the Deed of Trust and is therefore barred by § 51.003(a). However, as addressed *supra* Part III.D.2.a, § 51.003(a) is not applicable in this action.

66. Accordingly, the Court finds under the terms of the Construction Loan Guarantee and the Mezzanine Loan Guarantee, WLSAC was damaged in the amount of $20,845 for unreturned security deposits.

---

156. Plaintiff's Exhibit 177.

157. Joint Exhibit 7, ¶ 3.9; Joint Exhibit 8, ¶ 1.1.8.

158. Plaintiff's Exhibit 178.

159. Even if WSLAC were aware prior to September 2009, any obligations incurred under the Construction Loan Guarantee required

written demand. Written demand was not made until June 30, 2010.

160. Joint Exhibit 7, ¶¶ 3.1; Joint Exhibit 8, ¶ 1.1.1.

161. Plaintiff's Exhibit 70.

162. *Testimony of Bezold*, Transcript at 486.

### 7. Attorneys' Fees

### a. The attorneys' fees are properly assessed as damages

67. The Court first turns to whether the claim for attorneys' fees in this action is properly analyzed as an element of damages or whether attorneys' fees are instead properly awarded as costs.

68. Kaleh contends that WSLAC has pleaded attorneys' fees as an element of damages and therefore produced insufficient evidence to prove the reasonableness of the attorneys' fees at trial. WSLAC contends it sufficiently proved attorneys' fees at trial and, if it did not, it is entitled to collaterally obtain them post-trial on a Rule 54 motion. Kaleh contends that WSLAC waived its right to obtain attorneys' fees on a post-trial motion by pleading them as part of its damages and attempting to prove up that damages category at trial.

69. The provision in the Guarantees that WSLAC asserts it is entitled to attorneys' fees under reads: "To the extent that Lender incurs any costs or expenses in protecting or enforcing its rights under this Guarantee or under any of the documents that grant Lender a lien on the collateral, including, but not limited to, reasonable attorneys' fees and the costs and expenses of litigation, such costs and expenses will be due on demand, will be a direct and primary obligation of Guarantor, will be secured by the collateral and will bear interest from the incurring or payment thereof at the Default rate."[163]

 70. While the Court determined Ohio substantive law applies to the action, generally Texas law would govern matters of procedure and remedy.[164] *See*

*Illinois Tool Works*, 194 S.W.3d at 532. However, "[an attorneys'] fee award is governed by the same law that serves as the rules of decision for the substantive issues in the case." *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir.2002). Additionally, "[s]tate law controls both the award of and the reasonableness of fees awarded where state law supplies the rule of decision." *Id.* As Ohio substantive law controls this case, the right to any award of attorneys' fees and the subsequent analysis of the reasonableness of those fees is controlled by Ohio law. The Court therefore turns to whether under Ohio law the attorneys' fees sought in this case are assessed as costs or awarded as damages.

 71. Under Ohio common law, attorneys' fees are in the nature of costs. *Christe v. GMS Mgt. Co., Inc.*, 88 Ohio St.3d 376, 726 N.E.2d 497, 499 (2000). "Ohio adheres to the 'modern theory' that costs 'are in the nature of incidental damages allowed to indemnify a party against the expense of successfully asserting his rights in court.'" *Id.* (citing *Symons v. Eichelberger*, 110 Ohio St. 224, 144 N.E. 279, 283 (1924)). The award of attorneys' fees in the form of costs "must be based upon an express authorization of the General Assembly or upon a finding that the losing party has acted in 'bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons.'" *Westfield Cos. v. O.K.L. Can Line*, 155 Ohio App.3d 747, 804 N.E.2d 45, 53–54 (2003). However, attorneys' fees are allowable in breach of contract cases as damages "where the parties have bargained for this result and the breaching party's wrongful conduct has led to the legal fees being incurred." *Id.* at 53–

---

**163.** Joint Exhibit 6, ¶ 7; Joint Exhibit 7, ¶ 8; Joint Exhibit 8. ¶ 7. The Mezzanine Guarantee also provides: "The personal liability of Guarantor with respect to the items set forth above will include liability for Lender's attorneys' fees and other costs of collection under the Mezzanine Loan Documents and this Guarantee." Joint Exhibit 8. ¶ 1.

**164.** *See* Part III.B.2 ¶ 13.

54; *Stonehenge Land Co. v. Beazer Homes Invests., L.L.C.*, 177 Ohio App.3d 7, 893 N.E.2d 855, 869 (2008).

72. Here, WSLAC has not directed the Court to a statute authorizing attorneys' fees in this action. Nor has WSLAC pleaded it is entitled to attorneys' fees based on Kaleh acting in "bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons." Instead, the basis for WSLAC's entitlement to attorneys' fees is the contractual provisions of the Guarantees.[165] Here, WSLAC and Kaleh bargained for Kaleh's liability for attorneys' fees incurred in enforcing the terms of the Guarantees and the underlying obligations. Thus, contractual attorneys' fees are allowable as damages. Accordingly, the Court finds any attorneys' fees awarded in this action are properly assessed as damages and not as costs.

73. The Court finds WSLAC is entitled to attorneys' fees as damages in this action. Under the terms of the Guarantees, Kaleh was liable for any attorneys' fees incurred in enforcing WSLAC's rights under the Guarantees' terms, as well as for attorneys' fees incurred on the underlying loan documents.[166] The Court found that Kaleh breached his obligations under the Guarantees, Therefore, WSLAC is entitled to recover attorneys' fees incurred in enforcing its rights.

74. Kaleh contends that the attorneys' fees are part of the deficiency and therefore barred by § 51.003(a). However, as addressed *supra* Part III.D.2.a, § 51.003(a) is not applicable in this action.

### b. WSLAC produced insufficient evidence to prove attorneys' fees as damages at trial

75. As WSLAC is entitled to an award of attorneys' fees as damages under Ohio law, the Court next addresses the reasonableness of the claimed fees under Ohio law. *See Mathis*, 302 F.3d at 461 (holding the reasonableness of attorneys' fees is also analyzed under the law of the state providing the substantive rules of decision). WSLAC not only must prove entitlement to contractual attorneys' fees, it also bears the burden to prove the reasonableness of the attorneys' fees. *Stonehenge*, 893 N.E.2d at 869 (holding even though a party may be contractually entitled to attorneys' fees it still bears the burden of proving reasonableness). "[T]he party requesting the award bears the burden of providing evidence of any hours worked that would be properly billed to the client." *Unick v. Pro–Cision, Inc.*, 2011 WL 1005429, at *5 (Ohio Ct.App.2011). The requesting party should produce billing records sufficient to discern whether all hours were necessary to the action. *Id.* "The requesting party also bears the burden of proving the attorney's hourly rate, and of establishing that the hourly rate is reasonable" *Id.* at *6. In addition to an attorney's own affidavit, the requesting party must produce satisfactory evidence showing the requested rates are in line with the prevailing rates in the community for similarly situated attorneys. *Id.*

76. WSLAC contends it is entitled to recover a total of $925,956 for attorneys' fees and costs incurred in connection with the Meritage Property.[167] WSLAC asserts

---

**165.** *Complaint*, Document No. 1, ¶¶ 23, 33.

**166.** Entitling WSLAC to recover "any costs or expenses in protecting or enforcing its rights ... under any of the documents that grant Lender a lien on the collateral, including, but not limited to, reasonable attorneys' fees. ..." Joint Exhibit 6, ¶ 7.

**167.** This amount includes the estimates of the attorneys' fees incurred after the May 31, 2015 date used in Plaintiff's Exhibit 172, as well as fees which would be incurred on an appeal.

it paid the following amounts: (1) $262,626.26 to Baker Botts; (2) $70,077.82 to Frost Brown Todd; and (3) $472,419.53 to Vorys, Sater, Seymour and Pease ("Vorys"), for services rendered through May 2015.[168]

77. Ohio utilizes the lodestar method to calculate the award of reasonable attorneys' fees. The lodestar is calculated by determining the "the number of hours reasonably expended on the case times an hourly fee." *Bittner v. Tri–County Toyota, Inc.*, 58 Ohio St.3d 143, 569 N.E.2d 464, 466 (1991). The lodestar provides an objective starting point from which to make an estimate of the value of a lawyer's services. *Id.*

78. After the lodestar is calculated, that baseline calculation can be modified under the *Bittner* factors by considering the following; (1)"the time and labor involved in maintaining the litigation"; (2) "the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services"; (3) "the attorney's inability to accept other cases"; (4) "the fee customarily charged; the amount involved and the results obtained"; (5) "any necessary time limitations"; (6) "the nature and length of the attorney/client relationship"; (7) "the experience, reputation, and ability of the attorney"; and (8) "whether the fee is fixed or contingent." *Id.* at 467 (now codified in PROF. COND. R. 1.5(a)). "All factors may not be applicable in all cases and the trial court has the discretion to determine which factors to apply, and in what manner that application will affect the initial calculation." *Id.*

79. At trial, WSLAC offered the following evidence to prove the reasonableness of the attorneys' fees incurred in this ac-

tion: (1) the expert testimony of Paul Kerlin ("Kerlin"), counsel at Vorys; (2) a spreadsheet listing the invoice dates and amounts from Baker Botts and Frost Brown Todd;[169] and (3) the remittance statements from Vorys through May 2015.[170]

80. The Court first addresses whether Kerlin was entitled to give expert testimony on the issue of attorneys' fees where he did not produce an expert report. The admission of expert testimony in a diversity action is governed by the Federal Rules of Civil Procedure. *Mathis*, 302 F.3d at 459. Pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) the disclosure of a "witness who is retained or specially employed to provide expert testimony in the case" shall "be accompanied by a written report." FED. R. CIV. P. 26(a)(2)(B), However, "attorneys testifying solely on the topic of attorneys' fees are not required to provide expert reports." *Kondos v. Allstate Tex. Lloyds*, No. Civ.A. 1:03–CV–1440, 2005 WL 1004720, at *18 (E.D.Tex. Apr. 25, 2005) (Crone, J.). Accordingly, the Court finds it was permissible to admit Kerlin to testify as an expert on attorneys' fees despite there being no expert report produced.

81. Having determined Kerlin's expert testimony is admissible, the Court next turns to the sufficiency of the evidence to prove the reasonableness of the fees incurred for each firm involved in the various stages of the Meritage litigation.

**i. Baker Botts fees**

82. As to the $262,626.26 in fees incurred with Baker Botts, WSLAC only submitted Kerlin's expert testimony and a spreadsheet purporting to reflect the total amount of the invoices paid.

**168.** Plaintiff's Exhibit 172.

**169.** Plaintiff's Exhibit 40.

**170.** Plaintiff's Exhibit 41; Plaintiff's Exhibit 42.

83. WSLAC fails to meet its burden of proof at trial to show the reasonableness of these fees. Kerlin testified the hourly rate in the community for commercial litigation was $270. However, he had no knowledge of the hourly rates actually charged in these matters by Baker Botts. Nor did Kerlin have knowledge of the hours actually expended on these matters. Instead, Kerlin just estimated how many hours Baker Botts may have expended based on his knowledge and experience. Without the submission of invoices detailing the work done, the hours expended and billing rates, there is no way to determine whether these fees were reasonably incurred to even establish the minimum baseline for the lodestar method. Nor were the actual invoices produced. The only evidence as to what fees were incurred was a spreadsheet compiled by Bezold listing the invoice dates and amounts. WSLAC bears the burden to establish all hours billed were necessary and that the hourly rates are reasonable. Without testimony as to the hours billed, the nature of the work billed, and the timekeepers' rates that billed the work, WSLAC fails not only to prove the minimum reasonableness of the fees, but also to provide a basis under the *Bittner* factors to analyze the lodestar.

84. The Court need not address whether Kerlin's testimony alone without the submission of billing invoices would be sufficient to prove up the reasonableness of the attorneys' fees. The content of Kerlin's testimony fails to establish the number of hours actually billed by or the rates actually charged by Baker Botts. Thus, even if, testimony alone without itemized documentation of the billing could prove up attorneys' fees, Kerlin's testimony would not have been sufficient to do so. Accordingly, the Court finds that WSLAC failed to meet its burden of proof to show the reasonableness of the Baker Botts attorneys' fees incurred.

### ii. Frost Brown Todd fees

85. As to the $70,077.82 in fees incurred with Frost Brown Todd, WSLAC only submitted Kerlin's expert testimony and a spreadsheet purporting to reflect the total amount of the invoices paid.

86. WSLAC fails to meet its burden of proof at trial to show the reasonableness of these fees. Kerlin testified the hourly rate in the community for commercial litigation was $245. However, he had no knowledge of the hourly rates actually charged in these matters by Frost Brown Todd. Nor did Kerlin have knowledge of the hours actually expended on these matters. Instead, Kerlin just estimated how many hours Frost Brown Todd may have expended based on his knowledge and experience. Without the submission of invoices detailing the work done, the hours expended and billing rates, there is no way to determine whether these fees were reasonably incurred to even establish the minimum baseline for the lodestar method. Nor were the actual invoices produced. The only evidence as to what fees were incurred was a spreadsheet compiled by Bezold listing the invoice dates and amounts. WSLAC bears the burden to establish all hours billed were necessary and that the hourly rates are reasonable. Without testimony as to the hours billed, the nature of the work billed, and the timekeepers' rates that billed the work, WSLAC fails not only to prove the minimum reasonableness of the fees, but also to provide a basis under the *Bittner* factors to analyze the lodestar.

87. The Court need not address whether Kerlin's testimony alone without the submission of billing invoices would be sufficient to prove up the reasonableness of the attorneys' fees.[171] Accordingly, the Court

171. *See supra* Part III.E.7.b.i ¶ 84.

finds that WSLAC failed to meet its burden of proof to show the reasonableness of the Frost Brown Todd attorneys' fees incurred.

### iii. Vorys fees

88. As to the $472,419.53 in fees incurred with Vorys, WSLAC only submitted Kerlin's expert testimony and remittance statements reflecting the amounts Vorys invoiced though May 31, 2015.

89. WSLAC fails to meet its burden of proof at trial to show the reasonableness of these fees. Kerlin testified the hourly rate in the community for commercial litigation was $270 in Texas and $245 in Ohio. Kerlin did testify that his rate was $425, Richardson's was $350, and Stuckey's was $190. However, his testimony also indicated there was a fourth attorney who worked on the matter whose rate was not given, as well as an unknown number of paralegals for whom no rate was given. Kerlin did not provide a breakdown of the hours or work attributable to which timekeeper. Additionally, while Kerlin testified that 1089 hours through May 31, 2015, were expended on the matter, he only gave a general overview of what work was done during those periods. Without a breakdown of how many hours were spent by who on particular discovery matters, motions, and trial preparations, it is insufficient to merely state the total hours worked and some of the timekeepers' rates. WSLAC bears the burden to establish all hours billed were necessary and the hourly rates are reasonable. The remittance statements submitted by WSLAC are insufficient to do so. All the statements reflect is an amount paid with no indication as to what work was done and at what rate. Without testimony as to the hours billed, the nature of the work billed, and the timekeepers' rates that billed the work, WSLAC fails not only to prove the minimum reasonableness of the fees, but also to provide a basis under the *Bittner* factors to analyze the lodestar.

90. As to the eight hours Kerlin testified were billed between June and August 2015, insufficient evidence was presented as to reasonableness of those fees. Kerlin testified $2,000 was billed for this time. That would average to $250 per hour. The hours were billed for pre-trial communication with witnesses and the client. However, there was no testimony as to who actually did this work. If it was an attorney then $250 would likely be a reasonable rate; however, if the work was done by a paralegal the rate likely would not be reasonable. Accordingly, without any evidence as to who actually was doing the pre-trial communication and what would be a reasonable rate for that person, WSLAC fails to meet its burden of proof.

91. As to the 200 hours Kerlin testified were billed at a rate of $278 for September and October 2015, for the pre-trial work in an estimated amount of $55,600, Kerlin offered no testimony providing a breakdown of what work was done by which timekeeper or how many hours were spent on which matters. Without linking the amount of time spent on each matter to specific timekeepers, a general description of the work done, the total hours billed, and the average rate is insufficient to meet WSLAC's burden of proof.

92. The Court need not address whether Kerlin's testimony alone without the submission of billing invoices would be sufficient to prove up the reasonableness of these attorneys' fees.[172]

 93. As to the $41,700 in damages for fees on appeal, the Court finds that Kerlin's expert testimony was sufficient to prove these damages. Kerlin testified in his experience 150 hours would reasonably

---

**172.** *See supra* Part III.E.7.b.i ¶ 84.

be expended on an appeal of this complexity. He also testified the rate those hours would be charged at was $278, and that rate was probably conservative. The Court agrees the estimated hours and rate are probably conservative. Because these fees have not yet been incurred, the only evidence that could prove the reasonableness is expert testimony. There was no specific cross-examination as to Kerlin's expert opinion on the amount of damages for attorneys' fees on appeal and the reasonableness of those fees. Accordingly, the Court finds by a preponderance of the evidence that $41,700 in attorneys' fees for appeal is reasonable and WSLAC is contractually entitled to those fees under the terms of the Guarantees.

### iv. Total proved damages for reasonable attorneys' fees

94. Accordingly, the Court finds WSLAC proved by a preponderance of the evidence at trial it was entitled to recover $41,700 in reasonable attorneys' fees under Ohio law.

### c. WSLAC is not entitled to supplement its evidence at trial on a post-judgment motion

95. The Court next turns to whether WSLAC was required to prove its attorneys' fees as damages at trial or whether it is entitled to supplement its trial testimony on a post-judgment motion.

96. A Rule 54 post-trial motion for the award of attorneys' fees is not available to WSLAC. Federal Rule of Civil Procedure 54(d)(2)(A) provides a claim for attorneys' fees may be made by motion "unless the substantive law requires those fees to be proved at trial as an element of damages." Fed. R. Civ. P. 54(d)(2)(A). Under Ohio law, the award of attorneys' fees in this suit is properly assessed as damages to be proved at trial, not costs. As such, under the Federal Rules of Civil Procedure, WSLAC is precluded from seeking an award of attorneys' fees pursuant to Rule 54.[173] Therefore, the Court looks to whether under Ohio law, WSLAC would be entitled to a post-judgment hearing on attorneys' fees that are assessed as damages at trial.[174]

---

**173.** WSLAC asserts the Fifth Circuit's holding in *Richardson v. Wells Fargo Bank, N.A.*, 740 F.3d 1035 (5th Cir.2014), controls whether it is entitled to attorneys' fees on a post-judgment motion. *Richardson* is distinguishable. *Richardson* analyzed whether the attorneys' fees contract provision at issue should be assessed as damages under Texas law. *Id.* at 1037–38. The Fifth Circuit held the provision was expressly distinguished from damages, as the fees were not an independent ground of recovery, which would categorize the fees as damages under Texas law. *Id.* at 1038. Here, Ohio, not Texas law, governs the classification of the attorneys' fees as costs or damages. The award of attorneys' fees based on contractual provisions is classified as damages under Ohio law. Nor does *Richardson*'s discussion of the availability of a Rule 54 motion provide support for WSLAC's contentions. *See id.* at 1039–40. Rather, *Richardson* discusses the norm under Rule 54 is that attorneys' fees sought pursuant to a contract are classified as damages, but that there is no bright-line rule

that contractual fees must be considered damages. *Id.* Instead, "[t]he language of the contract and the nature of the claim are the dispositive factors concerning whether the fees are an element of damages or collateral litigation costs." *Id.* at 1039. Here, the nature of the claim is dispositive. Under Ohio law, contractual attorneys' fees are damages. Therefore, despite any label in the Guarantees stating these attorneys' fees are costs, that label does not control the classification where the fees are unavailable as costs pursuant to the governing state law. Hence, *Richardson* does not compel this Court to allow WSLAC to file a Rule 54 motion.

**174.** The parties have not addressed whether under *Erie*, even if Ohio law provided a right to a post-trial hearing when attorneys' fees are damages at trial the post-trial hearing would be procedural or substantive and whether it would conflict with Federal Rule of Civil Procedure 54.

97. Ohio law does not allow a court to entertain a post-judgment motion for attorneys' fees where the fees are sought as an element of damages at trial. Where the attorneys' fees sought are in the nature of damages, the court is "required to submit the issue to the [factfinder]".[175] *Stonehenge*, 893 N.E.2d at 869–70; 30 OHIO JUR. 3d DAMAGES § 152; *cf. Strip Delaware L.L.C. v. Landry's Restaurants, Inc.*, No. 2010 CA 00316, 2011 WL 3587455, at *5 (Ohio Ct.App.2011) (holding where evidence is presented at trial on a breach of guaranty claim that included attorneys' fees in the damages the court must determine "whether there is relevant, competent, and credible evidence upon which the factfinder could base his or her judgment"); *Berry v. Lupica*, 196 Ohio App.3d 687, 965 N.E.2d 318, 321, 323–24 (2011) (submitting attorneys' fees to the jury to determine amount of compensatory damages). Holding a separate post-trial hearing on the issue would be error. *Stonehenge*, 893 N.E.2d at 870. A party must prove both entitlement to attorneys' fee and the reasonableness of those fees at trial. *See id.* at 869.

98. *Stonehenge* also analyzed whether a court is required to entertain a post-trial motion for attorneys' fees from a prevailing defendant where the contract contains a fee-shifting provision. *Id.* at 865–68. As to the prevailing defendant, it would be error to not allow a post-trial motion because the right to the fees would not vest until the prevailing party was determined, which would fist require a jury verdict. *Id.* at 868; *see also* 30 OHIO JUR. 3D DAMAGES § 94 (stating a party is not required to seek attorneys' fees for a successful defense until after a favorable jury verdict is rendered). A prevailing party for purposes of a contractual fee-shifting provision is defined as "one in whose favor the decision or verdict is rendered and judgment entered." *Id.* Where a defendant does not acquire the right to fees until a jury renders a verdict in its favor, it is error not to allow a post-trial motion. *Id.* Yet *Stonehenge* also held the plaintiff was required to present the evidence on attorneys' fees at trial under the same contractual provision. *Id.* at 868–70. The Court reconciles *Stonehenge*'s seemingly conflicting holdings by reading the case law as follows: A party that bears the burden of proof is required to prove contractual attorneys' fees as an element of their damages resulting from the breach at trial; however, a party defending against a claim would not be entitled to contractual attorneys' fees until it mounts a successful defense, and thus, is entitled to a post-trial hearing. *Stonehenge*'s holding therefore indicates that entitlement to a post-trial motion on attorneys' fees turns on which party bears the burden of proof at trial.

99. WSLAC bore the burden of proof at trial on the breach of guaranty claim as the complaining party. Unlike the *Stonehenge* defendant who would not be entitled to attorneys' fees under the fee-shifting provision until a verdict was rendered, WSLAC has consistently claimed it is entitled to attorneys' fees as a category of damages.[176] WSLAC proceeded to put on evidence at trial that the attorneys' fees were a category of damages.[177] Additional-

---

175. The Court notes that *Stonehenge* involved a jury trial rather than a bench trial. However, as the attorneys' fees were damages, the Court finds the fees were required to be proved up during WSLAC's case-in-chief to the Court as the fact-finder.

176. Defendant's Exhibit 10 at 2; *Testimony of Bezold*, Transcript at 507-08.

177. WSLAC, having pleaded attorneys' fees as damages and putting on evidence of those attorneys' fees as damages at trial, was on notice of the standard required to prove the reasonableness of the attorneys' fees. Ohio, Texas, and the Fifth Circuit all utilize the lodestar method.

ly, the Court found under Ohio law the attorneys' fees here are assessed as damages. Accordingly, the Court finds that because WSLAC bore the burden to prove the entitlement to and reasonableness of the attorneys' fees at trial as element of damages, the Court's analysis is limited to evidence presented at trial.

100. WSLAC contends two Ohio cases hold it is entitled to a post-trial hearing. Those cases are distinguishable. In *Clean Wood Recycling, Inc. v. Tony's Landscaping, Inc.*, No L–14–1074, 2014 WL 6679181 (Ohio Ct.App.2014), the trial court had refused to enforce the parties' contractual agreement to award attorneys' fees based on a party's pre-trial unresponsiveness. *Id.* at *2–3. The appeals court held it was error to refuse to enforce the contract and remanded for the trial court to determine the reasonable amount of attorneys' fees owed. *Id.* at *3. Accordingly, *Clean Wood Recycling* does not stand for the proposition that a party may prove contractual attorneys' fees post-trial, only that a trial court cannot refuse to enforce a contractual provision. The Court here is not refusing to enforce the contractual provision in the Guarantees, only finding that WSLAC was required to prove the reasonableness of those damages at trial. Nor does *Meade v. Nelson Auto Group*, No. 14–96–45, 1997 WL 208685 (Ohio Ct.App.1997), support holding a post-trial hearing. *Meade* involved the statutory entitlement to attorneys' fees as the prevailing party. *Id.* at *5–6. The court held failing to hold a post-trial hearing on attorneys' fees was error because the prevailing party is not determined until after a trial on the merits. *Id.* at *7. Additionally, the issue of the prevailing defendant's entitlement to attorneys' fees should not be raised during the case in chief to "avoid unnecessary and arbitrary awards by the finder of fact." *Id.* at *6. Instead, the award of fees to a prevailing party is a matter for the court, not a jury. *Id.* However, here the entitlement to attorneys' fees was required to be presented as part of the case in chief because the contractual attorneys' fees sound in damages. Accordingly, given that WSLAC was required to submit the issue of attorneys' fees and the fees' reasonableness to the fact-finder at trial, WSLAC is not entitled to a post-trial motion or hearing to cure any deficiencies in the evidence presented at trial.

### d. Attorney-client privilege does not excuse WSLAC's failure to provide sufficient evidence of reasonableness of the fees

101. WSLAC also asserts it did not have to submit contemporaneous billing records because under Ohio law they are protected by attorney-client privilege. Billing records are not protected by attorney-client privilege if the records are limited in scope and only convey information pertaining to "explaining the fee, they type of work billed for, or the purpose of the litigation." *Shell v. Drew & Ward Co., L.P.A.*, 178 Ohio App.3d 163, 897 N.E.2d 201, 206 (2008). If, however, the billing records "reflect[ ] legal strategies of the attorney and provides insight about the attorney's thoughts concerning the direction of the litigation" they are protected. *Id.* When billing records are sought in discovery, the party asserting the privilege has the burden of timely demonstrating to the court the "contested invoice material was protected by attorney-client privilege." *Invacare Corp. v. Fay, Sharpe, Beall, Fagan, Minnich & McKee*, No. 77600, 2000 WL 1739296, at *4 (Ohio Ct. App.2000). The party seeking to exclude the invoices also must seek timely in camera review. *Id.* Failure to timely seek in camera inspection waives any error in not providing review. *Id.*

102. In this case, Kaleh never requested the production of the billing records for

the legal work for which WLSAC asserts damages.[178] Kaleh's post-trial motion asserts the billing invoices should have been produced in response to the requests for production and interrogatories.[179] However, those discovery requests were not submitted into evidence at trial or to the Court as an exhibit to the post-trial motion. Without those documents being placed before the Court for examination as to the scope of the request, the Court finds, on the evidence offered at trial, or any post-judgment motion, that the billing records were not requested in discovery.[180]

103. Because Kaleh never requested discovery of the billing records, WSLAC never produced a privilege log. A privilege log would "only include those documents actually requested for formal production and asserting privilege claims as provided in Rule 26(b)(5)(A)." 2006 ADV. CMTE. NOTES TO FED. R. CIV. P. 26(b)(5)(A). Thus, because Kaleh never sought discovery of the billing records, the first time WSLAC would have asserted the records were subject to attorney-client privilege was at trial when Kaleh contended the evidence was insufficient to prove reasonable attorneys' fees as damages.

104. However, WSLAC bore the burden of proof at trial to prove both entitlement to the attorneys' fees and the reasonableness of the fees. WSLAC could have produced in discovery a redacted copy of the detailed billing invoices that removed any information it claimed was privileged. If Kaleh had objected to the redaction, the Court could have reviewed the documents in camera. Instead, WSLAC made a tactical decision to not produce redacted billing records or submit them into evidence at

trial. The burden of proof as to the reasonableness of the fees was on WSLAC. WSLAC put on evidence of attorneys' fees at trial as part of its damages claim. Even if the billing records contain privileged information under Ohio law, that does not excuse the failure to introduce the records as exhibits at trial to prove up reasonableness or provide grounds justifying a post-trial hearing to cure what amounts to an evidentiary defect caused by WSLAC's tactical decision. Accordingly, the Court finds, even if the billing records were privileged under Ohio law, that privilege did not excuse the lack of introduction of those records into evidence.

## III. CONCLUSION

Based on the foregoing, the Court hereby

**ORDERS** that Defendant George W. Kaleh pay Western-Southern Life Assurance Company the sum of $3,885,439.22 for the following damages proved at trial:

- $2,537,561.78 on the deficiency
- $351,209.47 on the settled liens
- $86,749.97 on the unpaid insurance premiums
- $847,373 on the unpaid taxes, penalties, and interest
- $20,845 on the unreturned security deposits
- $41,700 in attorneys' fees

The Court will issue a separate Final Judgment.

---

178. *Testimony of Kerlin*, Transcript at 630–33.

179. *Defendant George W. Kaleh's Response to Plaintiff's Post-Trial Brief Regarding Attorney's Fees and Objection to WS's Request to Supplement its Fees Pursuant to Fed. R. Civ. P. 54(d)(2)(A)*, Document No. 102 at 8-11.

180. Given the Court's finding that privilege did not excuse the lack of evidence presented at trial, *infra* Part III.E.7.d ¶ 104, even if the documents had been requested, a finding otherwise does not prejudice Kaleh.

## FINAL JUDGMENT

The Court has contemporaneously issued its Findings of Fact and Conclusions of Law in the above-styled matter. Accordingly, based on the findings of fact, analysis, and conclusions of law set forth in the Court's order contemporaneously dated, the Court hereby renders judgment for Western-Southern Life Assurance Company and declares that the Court hereby

**ORDERS** that George W. Kaleh pay Western-Southern Life Assurance Company the sum of $3,885,439.22.

**THIS IS A FINAL JUDGMENT.**